[No. 28770. *En Banc.* July 16, 1943.]

EDWARD NEWTON, *Respondent,* v. PACIFIC HIGHWAY TRANSPORT COMPANY, *Appellant.*[1]

*John D. MacGillivray, J. E. Hullin,* and *Skeel, Mc-Kelvy, Henke, Evenson & Uhlmann,* for appellant.

*Samuel L. Crippen,* for respondent.

[1] Reported in 139 P. (2d) 725.

ROBINSON, J.—█ This is an action to recover for personal injuries received in a collision between an automobile and a truck and semitrailer. The briefs of the parties differ widely as to the evidence. The appellant has supported its factual statements by citations to the record, as Rule XVI (1), Rules of the Supreme Court, 193 Wash. 23-a, requires. The respondent, except in a few instances, has omitted to do so. All factual statements in briefs should be supported by citations to the statement of facts, and especially when it is claimed that the evidence has been incorrectly stated by an adversary. On this appeal, the principal question is: Should the trial court have held, as a matter of law, that the respondent was guilty of contributory negligence? It would have been of great assistance to the court if the respondent had cited the pages of the record where the scattered items of evidence, which, he contends, made the matter of contributory negligence a jury question, appear, instead of leaving it to the court to hunt for them through the recorded testimony of twenty-five witnesses. We have adverted to this matter, not to censure respondent's counsel, who in so far as he has disregarded Rule XVI (1), has but followed a practice which has, of late, become increasingly common, but because we desire to notify the bar generally that disregard of this rule can no longer be tolerated.

The collision occurred at McCleary, Washington. One of the controlling facts is the exact time of the collision, since that affects the question of visibility. As to this, there is much conflict. Although the weight of the evidence points to a somewhat earlier time, there is evidence which entitled the jury to find that the collision occurred at approximately nine o'clock p. m., or even a few minutes later. The day, it is agreed, was June 9, 1941. It was a clear, cloudless summer evening. The appellant's witnesses testified that it was "dusk," or "just getting dusk," or "twilight," or that

"visibility was one or two blocks," etc. One witness said that, when he heard the crash, he was sitting indoors by a window, reading a newspaper without the aid of artificial light. However, all of the respondent's witnesses who testified on that subject categorically stated that it was "dark." After verdict and for our present purposes, we must assume that it was.

The road through McCleary from the Grays Harbor country enters from the west, and is perfectly straight and practically level for a long distance, until, in midtown, it makes a right angle turn to the south. The hard-surfaced portion is twenty feet in width. Appellant's truck and semitrailer was en route from Aberdeen to Olympia with a load of freight. It had stopped at a warehouse located on the south side of the straight of way leading into McCleary, about four hundred feet west of the right angle turn, to unload a 650 pound barrel of oil. The south shoulder of the road between the hard-surfaced portion and the warehouse platform was seventeen feet in width. There was a smooth, firm shoulder on the opposite side of the road, more than ten feet wide.

The driver, of course, could not lay his trailer alongside and parallel to the warehouse and pick up a 650 pound barrel and put it in the building. It was necessary to put his trailer in such a position that the tail gate would open toward the platform. When so parked, he could bridge the gap with a steel plate and roll the barrel across. He accordingly backed in at an angle, the front end of the trailer angling toward the east, and the truck and trailer was "jackknifed" so that the truck or tractor portion faced somewhat to the southeast. As the trailer was about twenty-six feet long, this, despite the angle, left a portion of it extending into the traveled part of the road. As to the depth it so extended, the evidence is in conflict. It encroached at least to the middle of the south lane, and there is evidence from which the jury could find that

it extended to within two feet of the center line of the pavement. Intending to remain there but a few moments, the driver did not put out flares. Conceding that it was not possible to park in any other manner, the omission to put out flares, since it was dark, was of itself a violation of the statutes, and, therefore, negligence *per se.*

The truck and trailer had standard, legal lighting equipment. On the left upper front corner of the trailer, there was a three-way marker light, designed to show amber to the front and side and red to the rear; also, a three-inch amber reflector. On both the upper and lower rear corners, there were similar marker lights, designed to show amber to the front and red to side and rear. The rear of both truck and trailer had three-inch red tail lights, with adjoining reflectors of the same size and color, to serve as substitutes if the lights themselves, without the knowledge of the driver, should go dead while he was on the road. It is undisputed that all of these lights were operated by the same switch and that they complied with the statutes requiring them to be visible for at least five hundred feet; and, further, that on a clear night they would be visible at a much greater distance. We think the evidence shows conclusively that all of these lights were functioning at the time of the collision; but, of that later.

Respondent testified that he was driving twenty-five miles per hour as he approached the point of collision; that is, in accordance with the local speed requirement. There is testimony by at least two witnesses that he was making forty or fifty, and from still another, about fifteen. Clearly, that issue of fact was for the jury. He was bothered by the lights of a car simultaneously approaching from the other direction, and, after stating that he kept observing them, testified as follows:

"I glanced up to see whether the other car was in its right position on the road and as I glanced back to my side of the road—just the moment I glanced back, something loomed up in front of me—just something

there. I involuntarily put on my brakes I suppose, although I don't recall. I had no time. I was probably in just a few feet from it. Q. Then you crashed, did you, into this object? A. Yes."

The car approaching from the other direction was driven by a Mr. Freer. It was a new Ford pick-up truck, recently state inspected. Freer testified that he saw the truck and tractor extending out into the highway when he came around the right angle turn four hundred feet to the east of it. He was driving fifteen or twenty miles per hour. Immediately after making the turn, he saw respondent's car approaching from the west, then about as far from the truck as he was. As they came closer together and when he was about seventy-five feet from the truck, he drove out on the north shoulder of the road to give the respondent plenty of room to pass it. The respondent was still about the same distance from the truck that he was. Respondent, without slacking speed or swerving, ran straight into the truck just as Freer got abreast of it, although, Freer said, "he had half the road or better to go around if he took the notion." Freer's lights were on low beam, and were so constructed as to shine slightly to the right.

The appellant says that its truck and trailer was lit up like a Christmas tree, and contends that the respondent, if using any care whatever, was bound to see it. It is contended that, if respondent had kept a proper lookout, he could have seen it even before Freer came around the corner. It is also contended that at no time could Freer's lights have prevented him from seeing it. They were on low beam and shone to the right, especially when Freer turned to the right to let him pass. At that time, respondent was about seventy-five feet from the truck, and, according to his own testimony, driving but twenty-five miles per hour. His car was nearly new and had perfect brakes. It is strongly urged that, under these circumstances, all

reasonable men must agree that respondent was negligent.

■ That unsatisfactory and illogical formula is universally employed by appellate courts in solving questions of this kind, even though its application not infrequently results, in effect, in a holding by five judges of an appellate court that the trial judge, ten or twelve jurors, and sometimes as many as four members of their own court, are not reasonable men. In spite of such consequences, the evidence in this case is such that we would feel compelled to employ it to hold that the respondent was guilty of contributory negligence, as a matter of law, were it not for a portion of the testimony given by C. L. Westenheiser, an officer of the state patrol. Much of his evidence was more favorable to the appellant than to the respondent, and from a consideration of the whole thereof (twenty pages) we think that he was an unprejudiced and impartial witness. He testified, in part, as follows:

"Q. On this question of lights coming the other way. If you are traveling on there and the position that this speed limit sign which you say is from three hundred feet to west to the place the truck was and there were red lights, these marker lights would be clearly visible for that distance of three hundred feet wouldn't they? A. They would, unless you were blinded. Q. At the time you were there there was another car approaching on the other hand the same distance of three hundred feet away, with its lights on low beam, that would not affect your vision of this tail light in front of you, would it? A. It could, to a certain extent. I don't think it would completely blind them out. . . . Q. If that car is one hundred or two hundred feet away or from three hundred to four hundred feet away from you, you still could be able to see this truck and trailer with its tail light and marker lights on? A. I wouldn't necessarily say so."

While the witness later said that he would think the truck could be seen, he refused, under further somewhat argumentative examination, to depart from

his attitude of doubt about the matter. When an expert in such matters testifies under oath that he cannot "necessarily say so," we who are not experts cannot say that *all* reasonable men would "necessarily say so." The question of respondent's contributory negligence was, therefore, for the jury, and the trial court did not err in overruling appellant's motion for judgment notwithstanding the verdict.

■ It was alleged by the plaintiff that "there was no light flare or other device whatever" on the appellant's vehicle. The appellant timely requested the court to withdraw that allegation of negligence from the jury, upon the ground that there was no substantial evidence to support it or create an issue of fact. The trial judge refused to do so, and instructed the jury as to that matter in language requested by the respondent, to wit:

"I instruct you that as to the question of whether or not the defendant had its lights on its vehicle turned on immediately prior to and at the moment of the collision, is a question of fact for you to decide."

Due and timely exception was taken by the defendant, and it is now urged that, in submitting that issue to the jury, the trial court committed reversible error.

No person whatever testified that the appellant's truck and trailer were not lighted immediately prior to and at the moment of collision. The respondent Newton's testimony is merely to the effect that he did not see any lights, and the greater part of his case was given over to showing that he could not see ahead because he was blinded by the lights of Freer's car. Specifically, his testimony was as follows:

"Q. Now, Mr. Newton, did you see any lights on any vehicle there or were there any flares there? A. I saw no lights whatever. . . . Q. *When you speak of lights, you mean that if there were any lights, you didn't see them? A. That is true.*" (Italics ours.)

Here, it will be noted that respondent himself interpreted his testimony to mean merely that he *saw* no lights. Even had he not done so, the trial court should have so interpreted it. While plaintiff's testimony that he *saw* no lights may, strictly speaking, be evidence, it must be regarded, under the circumstances shown, as unsubstantial and a mere scintilla.

In the recent case of *Hauswirth v. Pom-Arleau,* 11 Wn. (2d) 354, 119 P. (2d) 674, the court said:

"The only evidence offered by respondent upon that issue was the testimony of Richard Hauswirth, who merely stated that he saw no lights. That evidence was purely negative in character, had no more than speculative value, and did not constitute substantial evidence within the rule requiring that a finding or verdict must be supported by a preponderance of the evidence. *Poland v. Seattle, supra* [200 Wash. 208, 93 P. (2d) 379], and cases therein cited. On the other hand, there was positive, affirmative evidence that the lights were burning at the time."

In this case, also, there was much affirmative testimony that the lights were functioning. Respondent's counsel points out that a great deal of it refers to the lights which were on the east side of the trailer while respondent approached its left side; but there is undisputed evidence that all lights operated on the same switch. Respondent's counsel also points out that much of this testimony was given by four or five persons who rushed out of business places or their houses when they heard the crash, and contends that the lights might have been thrown on by the truck driver in that short interval. Respondent's counsel also calls attention to evidence that, when the patrol officer Westenheiser reached the scene immediately after the collision, the tail light on the truck or tractor portion of the vehicle, which was involved in and damaged by the collision, was not functioning. Westenheiser said:

"On examining it I found the wire had been cut and I put the two pieces of wire together and the light went on so I naturally assumed that that had been on."

This, in view of the positive evidence that the lights had been on and that they were all controlled by the same switch, is a sound assumption. See *Poland v. Seattle, supra,* where it was so held under very similar circumstances.

As has already been said, there was positive evidence that the lights were operating immediately prior to and at the time of the collision. The driver testified that he turned them on before parking the car, and that, as he walked around the vehicle to go to the warehouse, he saw that all its lights were operating. Further, there is the evidence of the proprietor of an oil station, who stood in front of his station, 134 feet to the *west* of the point where the truck and trailer were parked. He saw it there with its lights on as the respondent's car came toward him from the west. As it passed him, he turned to pick up a tire, and, when in the act of doing so, he heard the crash of the collision. Freer, who stopped his car a bit to the westward of the collision, testified that the lights of the truck and trailer were burning.

The colloquy between counsel and the trial judge concerning the matter now under discussion, which took place at the hearing of appellant's motion for a new trial, is in the record, and it conclusively appears therefrom that the trial judge refused to hold that the submission of the absence-of-lights issue to the jury was error, because he felt that the *Hauswirth* and *Poland* cases were "wrong." However that may be, it was his duty to recognize them as authority and to rule accordingly.

(It may be noted, parenthetically, that the rule of the *Hauswirth* and *Poland* cases, and of prior decisions to the same effect, has very recently been reaffirmed and applied in *Cox v. Polson Logging Co.,* decided May 17, 1943, *ante* p. 49, 138 P. (2d) 169.)

In *Burge v. Anderson,* 164 Wash. 509, 512, 3 P. (2d)

131, citing supporting cases extending from volume 48 to volume 158 of our reports, it was said:

"We have frequently and consistently held it to be error to submit to the jury a question where there was no *substantial* testimony upon which to base the instruction." (Italics ours.)

Many subsequent cases have applied the same rule. See, for example, *Thomas v. Inland Motor Freight,* 190 Wash. 428, 441, 68 P. (2d) 603, in which, as here, there were a number of acts of negligence pleaded, and in which it was held error to submit an instruction as to one of them which had not been supported by substantial evidence.

We cannot say that the error was harmless. Under the circumstances, it is not too much to say that at least some of the members of the jury must have had real difficulty in finding that the respondent was free from contributory negligence. Perhaps, they solved that difficulty by finding that there were no lights whatever, as the instruction and direction of the court permitted them to do.

There are a number of other errors assigned as to instructions both given and refused, and a final alternative contention that the verdict was excessive. These, in view of the disposition we have concluded to make of the cause, need not be considered.

This cause is remanded to the superior court of Pierce county, with directions to set aside the judgment appealed from and grant the appellant-defendant a new trial.

BEALS, STEINERT, JEFFERS, and GRADY, JJ., concur.

BLAKE, J. (dissenting)—Under the evidence, I think the court properly submitted to the jury the question of whether the lights on the truck were turned on immediately prior to and at the moment of collision. The plaintiff testified that he was watching the road ahead and did not see any lights. This is more than a scin-

tilla of evidence. Though negative in character, it is positive and substantial concerning the existence of a fact which depended wholly upon the testimony of witnesses. The sufficiency of such evidence to take a case to the jury is discussed at length in *Kahaley v. Frye & Bruhn*, 62 Wash. 43, 113 Pac. 247. Judge Chadwick, speaking for the court, said, p. 46:

"Now, to reverse and remand this case, we must hold, as a matter of law, that appellant's driver did, in fact, drop his forty-pound weight; or, in other words, 'securely fastened' his team within the meaning of that term as defined by the ordinance and the custom relied upon. While the circumstances tending to show a failure to do this are slight, in our judgment they are evidence, and their weight was for the jury. The eyewitnesses of the accident, who testified in support of plaintiff's case, say that they did not see any weight dragging under the wagon when the team passed. We think this was enough to carry the case to the jury upon the motion for nonsuit. Nor do we think this circumstance comes within the rule of negative testimony. If a person, seeing the accident and having an equal opportunity to observe, says that he did not see a certain thing or object, it is evidence, and the weight of it must be left to the jury, unless its character is so purely negative and the positive testimony is so plain that there can be but one conclusion drawn by the court or jury. The rule laid down in Jones on Evidence (2d ed.), 898, is:

" 'But the rule that positive testimony is of greater weight than negative has some important exceptions, and it should never come in conflict with the general rule that the weight of the testimony should be left to the jury; such testimony is admissible, and, together with corroborating circumstances, may outweigh positive testimony. As will be seen from the cases already cited, this question of the weight to be given to negative testimony often arises in railroad and other accident cases where it is claimed that signals were not given. In such cases the question is purely for the jury, and it has often been held that negative evidence was sufficient to sustain a verdict. It is familiar practice to allow a witness, after he has described the situation, to state that he would have heard a bell or whistle,

if it had sounded. The courts have frequently recognized a qualification of the general rule under discussion in those cases where one witness testifies that a fact occurred and another, having the same or better means of knowledge, testifies positively that it did not occur, each having testified as to his memory of the matter in difference.'

"And in Wigmore on Evidence, vol. 1, § 664:

" 'In applying the foregoing principle requiring that the witness' inferences be based on adequate data, courts have often been asked to exclude testimony based on what may be called *negative knowledge,* i. e., testimony that a fact did not occur, founded on the witness' failure to hear or see a fact which he would supposedly have heard or seen if it had occurred. But there is no inherent weakness in this kind of knowledge. It rests on the same data of the senses. It may even sometimes be stronger than affirmative impressions. The only requirement is that the witness should have been so situated that in the ordinary course of events he would have heard or seen the fact had it occurred.' "

The rule was applied in *Walker v. Butterworth,* 122 Wash. 412, 210 Pac. 813, wherein Judge Mackintosh said, p. 415:

"Appellant [defendant] and other witnesses testified to the fact that the lights upon his car were burning. The testimony in contradiction to this is very dim, but we cannot say that it was not sufficient to raise a question of fact which it was the province of the jury to determine. There was one witness in whose testimony the following occurs: 'Q. Did you see any lights on that dark machine? A. No, sir, no lights.' This element of negligence was properly submitted to the jury for its consideration."

And in *Cox v. Polson Logging Co., ante* p. 49, 138 P. (2d) 169, Judge Steinert recognized the rule, saying, p. 69,

"In those cases, however, and in others of similar import, it was shown that the *witnesses whose testimony was negative were so situated that, in the ordinary course of events, they would have taken cogni-*

*zance of the disputed fact had it occurred, . . ."*
(Italics mine.)

In the instant case, plaintiff was "so situated that, in the ordinary course of events, [he] would have taken cognizance of the disputed fact had it occurred"; in other words, he was in a position to see the lights had they been on. Though looking toward the truck, he testified he did not see its lights. This, under the rule, is equivalent to positive evidence that the lights were not on. "Negative knowledge" though it is, it should not be brushed aside as a mere scintilla of evidence.

I dissent.

MILLARD, J., concurs with BLAKE, J.

SIMPSON, C. J. (dissenting)—The majority's conclusion that the question of contributory negligence was for the jury is based entirely upon the testimony of a state patrol officer whose testimony is quoted.

The testimony of experts based upon hypothetical questions cannot create an issue. *In re Stern's Estate,* 244 N. Y. Supp. 250, affirmed, 261 N. Y. 617, 185 N. E. 762; *In re Stern's Will,* 256 N. Y. Supp. 54, 235 App. Div. 60.

I contend that there was no evidence in this case which could be the basis upon which to predicate the hypothetical question. In this connection, it is proper to note that hypothetical questions must be based upon the evidence in the case, not upon suppositions. *Levine v. Barry,* 114 Wash. 623, 195 Pac. 1003; Rogers on Expert Testimony (3d ed.), § 52.

There was no evidence that respondent was blinded by the lights of the approaching car. Mr. Freer, the driver of the approaching car, called as a witness for respondent, testified:

"A. As I made the corner on to the straight-away here (indicating) I was coming down this way and I noticed a truck parked in here (indicating). I guess this is the warehouse where he backed in . . . and also I noticed a car coming this way (indicating)

towards me. Before I got there I turned off of the highway on to the shoulder so this car, if he took a notion to go around the truck, would have the other half of the road, and just as I pulled by it goes into this truck and smashed into it. . . .

"Q. As you turned the corner down here at the end of the straight-away, your lights were on high or low beam? A. Low beam. . . .

"Q. With reference to where your lights hit the highway in front of you when on low beam in front of the car. About how far in front of your car do your lights hit the pavement? A. I would say approximately twenty or thirty feet. . . .

"Q. When you first saw Mr. Newton's car do you know how far to the west of the scene of the impact it was? A. I wouldn't say for sure, but I would imagine probably a hundred feet. . . .

"Q. I understand that before you reached the point of impact you turned off of the highway? A. Yes, I did. Q. That would be to your right? A. To the right, yes, off of the highway. Q. About how far before you reached the truck did you turn off of the highway to the right? A. Less than a hundred feet. Q. Approximately how far? A. Possibly seventy-five feet. Q. In turning off—you are coming from the east, in this direction (indicating)—were you on the right side of the highway, as you turned the corner? A. Yes. Q. Then, as you reached a point about seventy-five feet to the east of the point of impact, you turned to your right, off on the shoulder? A. Yes, I turned off. Q. The shoulder, as shown on the map, is approximately ten feet two inches wide, is that right? A. Yes. Q. As you turned to your right did you make a gradual turn? A. Yes. Q. At the time you were turning and straightening up, where were your lights on the car shining? A. Off of the road to the right some place. Q. That would be off to the right and to the northwest, is that correct? A. Northeast, or whatever it would be. Q. Here is your car in that direction? (indicating) A. That's right. Q. Your lights, during the course of making that turn, were not on the pavement at all? A. No. Q. After making the turn did you proceed on for the balance of that distance on the shoulder? A. Yes. Q. During all of that time your lights were on low beam? A. Yes. Q. *During any of that time*

*were your lights shining on the pavement? A. No, I
don't think so. Q. Where were they shining? A. On
the shoulder. Q. From the time this turning took place,
was it possible for your lights to blind someone ap-
proaching from the other direction? A. I don't think
so. . . .*

"*Q. Your lights were not shining on Mr. Newton's
portion of the highway? A. I don't think so, I don't
believe they could.*" (Italics mine.)

As I view this evidence, it proves conclusively that
the answer to the hypothetical question had nothing
to do with the accident, because it was not based upon
any evidence present in the case which indicated that
respondent was blinded by the lights of the approach-
ing car. That evidence did show, however, that re-
spondent's view of the lighted truck was in no wise
obstructed.

Moreover, the testimony of the officer was of a nega-
tive nature and of the same character condemned by
the majority.

The judgment should be reversed and the case dis-
missed.